No. 23-1625

UNITED STATES OF AMERICA

IN THE COURT OF APPEALS FOR THE SIXTH JUDICIAL CIRCUIT

on Appeal from the Judgment of the
United States District Court for the Eastern District of Michigan,
C.A. No. 20-cv-13303, Laurie J. Michelson, District Judge

ANNA MCKINNEY.
Plaintiff-Appellant,

v.

COUNTY OF MACOMB, MICHIGAN,
Defendant-Appellee.

APPELLANT'S REPLY BRIEF

ORAL ARGUMENT REQUESTED

CRANBROOK LAW GROUP, P.C.
BARRY R. POWERS
38550 Garfield Road, Suite A
Clinton Township, Michigan 48038
(248) 515-8599
Counsel for Plaintiff-Appellant
Anna McKinney

ARGUMENT

The proofs belie Appellee's factual assertions in its brief Its first factual assertion is that McKinney's supervisor, Traci Mancini, observed a decline in McKinney's abilities to perform her job. Brief of Appellee at p. 2). This assertion is based solely on Mancini's own subjective, conclusory, and speculative opinion given in her affidavit testimony (conceived and made only after this controversy rose to the level of litigation and which affidavit testimony, as such, was never made subject or available to cross-examination).

It cannot be reasonably disputed that this is improper and inherently unreliable opinion testimony given after the fact for purposes of litigation. Such averments do not qualify in any way as meaningful *res gestae* evidence. Appellee has been unable to offer or cite any admissible evidence of any acts ore omission contemporaneous with when the alleged "observations" were made. This is, *in toto*, Appellee can point to no evidence of occurrences, acts or omissions happening simultaneously and concurrently with the events in factual dispute. .

Further, Appellee offers no averments of any factual or legal support to demonstrate such conclusions as a matter of law. In its brief Appellee cites no proper evidence rebut the proofs, within the province of both McKinney and Appellee alike, that establish that McKinney was under all reasonable and usual circumstances of her employment, at least minimally capable if not downright deserving of accolades

under the circumstances, given her Herculean efforts to meet greatly increased job demands that Appellee mercilessly foisted on her suddenly, unexpectedly, unfairly, and without sufficient rationale or justification at all. That is, no one disputes or has disputed that when McKinney returned to work from medical leave, she not only resumed her usual and customary duties and her own substantial workload as a well experience social worker, but that she struggled mightily and valorously to perform the extra work Appellee suddenly demanded of her, without explanation.

McKinney resumed and handled with yeomanlike effort and ability not only her own workload but had to shoulder the workload of others. Appellee began assigned McKinney responsibilities above and beyond her own by requiring her to cover cases for others. At best, the affidavit testimony of Mancini amounts not to evidence of bad job performance but to nothing more than a naked, unsupported *contention* only that she *believed* without proof that McKinney's alleged struggles at work upon her return related to McKinney's mental illness that, in turn, resulted in a diminished ability to handle the excess work added to her usual caseload. Beyond that, Appellee presents even this "observation" wholly and unfairly out of context.

The complete and accurate story, in fact, is that the only impediments to perfect job performance McKinney faced, and hurdled, even with aplomb in many cases, were the direct and proximate result of Appellee's substantial and undue

material changes and increases in the terms and conditions of McKinney's employment, a design patently unfair to McKinney and even arguably misleading, in part, both to the trial court and to this court as set out in Appellee's brief. Such was not the fault of McKinney as a matter of fact, and no fault can be attributable as a matter of law to justify Appellee's summary and unjust dismissal of McKinney from further employment.

McKinney's proofs, including her testimony at trial, had she been permitted to offer them at trial, would plainly establish the alleged downfall of McKinney in her position, with such allegation hotly disputed by McKinney, was solely the fault of Appellee and through no substantial fault of her own. In fact, any salient shortcomings, if any, of McKinney while Mancini acted as her supervisor -- one in a string of many supervisors assigned to monitor McKinney's job performance – were only because Appellee had made the ill-conceived, if not maliciously-conceived, plan, made without attempting to obtain any input at all from McKinney beforehand, to drastically modify and substantially *increase* McKinney's job requirements. Adding insult to this injury was Appellee's further design to implement the additional material change of dispossessing McKinney of an office at the same time it was dramatically increasing her job responsibilities.

From the beginning and right up until present day, Appellee has offered no explanation of how this served any proper, legitimate, or even merely benign,

3

business purpose of Appellee in this sphere of its expansive operations.

Further, simultaneous with the additional workload, Appellee removed McKinney from her physical office and offered no other office to her for performance of a substantial part of her job duties. And all of this was done without justification or explanation, despite the patent unfairness of such impositions of impediments to McKinney's ability to perform tasks now demanded or her without cause. Appellee "went mobile" with her job, removing even her desk.

To do her best in this transition, and forced to do so by Appellee, McKinney work diligently to perform her duties despite the absence of an office, whether on the road, on customer visits, sometimes even out of her car, or otherwise, in part, remotely from home.

Appellee makes and has made not even the slightest attempt to justify such egregious actions affecting McKinney's employment before the lower court or before this Court. That is, no underlying rationale for either the prohibitive additional workload imposed on McKinney or the removal of her from any proper office at which to perform the necessary work has ever been offered by Appellee, both before the trial court and before this Honorable Court on review.

As the objective proofs amply establish, this was a major transition for McKinney, and Appellee not only refused to engage in the particularized   and

individualized analysis and the requisite iterative process under settled disability discrimination law, as already set out extensively in McKinney's opening brief, but did the very opposite. Appellee heaped such different and additional job duties on her to such an extent that no person reasonably qualified to perform such job could do so properly, despite *any* accommodation. In fact, no one may even conceive of any such reasonable accommodation that could in any way compensate for the plainly draconian changes and addition of duties to her job requirements. Such requirements were objectively insurmountable and thus not capable of reasonable performance by *any* person placed in that reconstituted job, not even the most adroit and skillful "super performer" hypothetically imaginable.

To boot, given McKinney's having been diagnosed as suffering from attention deficit disorder, a condition well known to Appellee and, in fact, actually exploited by Appellee for its own selfish benefit in seeking justification for its decision to move McKinney out. Because of this condition of hers, added to which was her other diagnosed of anxiety, could only possibly result in her struggling with the new structure and increased job demands, increased to the extent that no employee in McKinney's new role could possibly or even practically perform.

This development architected and imposed by Appellee, and with no fault of McKinney, made it more appropriate and fitting, as well as legally necessary, for McKinney to begin requesting of Appellee due consideration for reasonable

5

accommodations, all of which overtures fell on the self-imposed deaf ears of Appellee. When McKinney was told that her supervisor was adding *seven more people* to her work, she was forced to suggest respectfully to Appellee that such demands were unrealistic, unreasonable, and unfair. Her supervisor merely responded that she had no choice but to take on the additional work. Even under such conditions, McKinney was somehow able, miraculously, to keep up with the increased demands. Appellee's own PIP records reflect that McKinney did her best to meet these amplified job demands for some time until they got the best of her, presumably as Appellee had designed and desired. Among Appellee's own business records lies proof that, even as late as May 2016, for example, Appellee acknowledged in her job performance review that McKinney was doing commendable work.[1]

---

[1] Appellee next most insincerely posits that McKinney's "FMLA leaves" resulted in lackluster job performance. Appellee's Brief at p. 3. While this conclusory contention is the subject of reasonable material factual dispute on a genuine issue of law raised below, it is also an impermissible and illegitimate basis on which to support any factual or legal argument of Appellee. Indeed, it is nothing less than axiomatic that an employer may not use an employee's exercise of her lawful rights, such as taking leave as permitted as a matter of law by the FMLA as a basis upon which to discipline or otherwise disadvantage or discriminate against the employee in the terms and conditions of employment. McKinney's bona fide and unquestionable right under federal law to this leave of absence from work because of her medical condition of course would require her employer, during such period of leave, to avoid and ameliorate through its own absolute authority and efforts any cancellation of appointments and any undue imposition on other employees necessary to assume McKinney's workload. All McKinney may be blamed for in this regard is: 1) to have fallen sick to such degree as to have become sincerely,

Likewise, Appellee further seeks to rely on hearsay evidence set down in a one-sided "Performance Improvement Plan" ("PIP") made by McKinney's "last supervisor, Anita Garr. Appellees attempt to make much out of Garr's minor criticisms of the way McKinney performed her reporting and documentation responsibilities. Appellee's Brief at pp. 3-4. What Appellee fails to acknowledge, however, is crucial contrary and countervailing evidence attributable to Garr, herself, which rebuts and refutes the conclusory critical statements of McKinney attributable to Garr. For example, Appellee shamelessly ignores evidence of accolades that Garr bestowed on McKinney at the same time Garr is said to have been critical of McKinney's job performance, such as a printed text message from Garr as late as January 2019 in which Garr unequivocally praises, even congratulates, McKinney for meeting or exceeding productivity expectations.[2]

---

legitimately, and substantially in need of significant, though only temporary, medical attention and respite to get back on her feet again; and 2) to ask for help and understanding from her employer. No court, not even the trial court or this Honorable Court, may properly countenance any any employer to punish or penalize an employee for exercising such rights, especially  where, as here, there is not even a *claim* that the employee's medical, physical, and mental condition required that she invoke her rights to take such leave and then, actually, to take it.

[2] Additionally, in her text message of January 2019, Garr further acknowledges McKinney's professional competence, experience, and ongoing effectiveness in her position with Appellee; namely, that her work history demonstrates she is successful performing with flex time and when Appellee exercises less micromanagement, McKinney having always been looked upon favorably by peers, who esteemed her, and having always been the kind of social worker consistently sought after by clients for her superlative  work and accomplishments, especially when Appellee had been providing her with office and desk.

Nor has Appellee rebutted or even attempted to rebut evidence that McKinney's clients always received and continued to receive the assistance they needed from Appellee through McKinney's services. If McKinney truly had been falling so short over such a period of time, as Appellee belatedly contended by having to squarely contradict its own contrary and inconsistent statements, then how was it that the clients were fully satisfied with the services and attention McKinney bestowed on them? And if McKinney's performance had fallen to such a level of misfeasance or nonfeasance, then how is it that Appellee accepted such performance without imposing discipline, and how is it that Appellee did not seek to have her social work license suspended?

Also questionable and insincere is Appelle's further contention that "McKinney was removed from 7 cases." Appellee's Brief at p. 4. However, as note above, these cases were among the additional workload imposed by Appellee upon McKinney upon resumption what she expected to be normal, not multiplied, duties. It was McKinney, not Appellee, who fairly discerned right away that the increased load Appellee sought to level on McKinney was simply unrealistic.

As many as seven or more additional cases were too much for any reasonably skilled and qualified employee to bear, and the removal of those additional cases was, under the unique circumstances, only fair, in general, and only a reasonable accommodation of her disabilities, specifically. She asked for this accommodation

at the time Appellee sought to add such additional duties. Despite McKinney's emphasizing forcefully that this would only overwhelm her, especially in light of her recent hospitalization and suicide attempt and her already covering multiple cases, such overture was met only with the statement: "You can do it."

Yet, it was not until March 2019, *more than a year* after McKinney first requested such accommodation, that Appellee finally chose to grant such accommodation by lessening her workload by seven cases. Again, with the benefit of hindsight and now after the fact, after McKinney commenced this action, all that Appellee does in this litigation and in its Appeal Brief is seek to chastise McKinney for exercising unquestionable legal rights and seek to have this Court bestow its official imprimatur on such lawless conduct and litigation stratagems.[3]

---

[3] The evidence further belies Appellee's next contention that McKinney was not, in the estimation of Appellee, alone, "a candidate to work remotely." Appellee's Brief at p. 4. First, such a conclusion is not the unilateral province of Appellee and its skilled legal counsel to make as a matter of advocacy. Instead, that is the ultimate question in this litigation for the trier of fact to consider and judge on disputed questions of material fact in the final analysis. And, second, again, Appellee's own records and first-hand observations from first-hand experience demonstrate, in fact, that Appellee was most certainly fully capable of performing well by working remotely. For example, by this time McKinney had been working effectively on a long-term basis using flex time – this happened over a period of many years. McKinney performed sufficiently in such contexts without complaint or disciplinary action. Her history and hard and well-earned reputation, indisputably, amounted to her being considered "the best" at her job. To the extent she may have been criticized for falling behind was attributable only to her exercising excessive efforts to serve. Her only personal shortcoming in this regard, as acknowledged even by Appellee, was that she was overextending herself and may have been "doing too much" for her clients.

Next, Appellee contends that "McKinney started treating weekly with Dr. Deborah Greening, a licensed psychologist" (Appellee's Brief at p. 4), and that Greening's so-called "*medical* certifications" stood as "*medical* evidence" that "she cannot work" because of her depression and anxiety. Appellee's Brief at pp. 5-6 (emphasis added). What Appellee has chosen not to disclose to this Court, however, is that Greening was not a medical doctor and never served or acted as McKinney's medical doctor. McKinney was being seen by Greening only for counseling.

It was and is not within Greening's purview, qualifications, or expertise to opine properly as an expert witness, and no foundation has even been given by Appellee to sustain its attempt to introduce such evidence, plainly admissible and plainly impermissible for the trial court or this Honorable court to give any weight to such unqualified and, again, merely conclusory, opinions. The one person so qualified was, in fact, Dr. Nina Anderson, McKinney's actual treating physician, who opined that McKinney was, in fact, competent to perform her job with Appellee. Yet, Appellee in its brief conveniently chooses to ignore and make no mention of this countervailing and superior, evidence, which would be admissible at trial, were McKinney not deprived of her right to present her case to the jury in the below proceedings.[4] Appellee has not made and cannot make any satisfactory showing that

---

[4] Greening was not and could not medically treat McKinney. She acted only as counselor to McKinney. Further, Greening submitted documentation for FMLA

it ever acted in good faith to conduct any meaningful individual inquiry, contrary to

---

qualification purposes in which Greening made the contrary conclusions – not that McKinney's *emotional troubles were causing her problems at work* but that the conditions and demands of McKinney's employment resulted in t*roubles at work that were the causing her exacerbated mental health issues*. If anything, so internally contrary and inconsistent are Greening's own opinions – lay opinions at that to the extent she opines on medical matters for which she holds no qualifications – Greening's contradicting her own first conclusion with her own second conclusion constitutes one witness created a material question of fact on her own, militating strongly against the propriety of the entry of summary judgment preliminary, and improperly taking away McKinney's right, to a jury trial.

In any case, McKinney's primary care physician opined that work stress was causing her physical impairments such as a rash and that such health concerns recommended that McKinney take a break from certain work demands due to her increased stress levels, which documentation was timely provided to H.R. and is, thus, a matter and self-contained part of its own employment records on McKinney.

Beyond that, Appellee in its desperation wrongfully seeks to introduce evidence that it contends constitutes the receipt by McKinney of relief via SSDI that is inconsistent with, and compromises, McKinney's rights to seek redress under the ADA. Appellee's Brief at p. 6, fn. 1. First, in its opinion granting summary judgment, the trial court specifically noted that Appellee attempted to make this belated argument at the summary judgment stage and that such must be disregarded. It is, thus, being disallowed explicitly by the trial court in reviewing the record, not a matter within the scope of the below decision or properly a matter within the purview of the trial court the subject of proper adjudication in this appeal. Such must be categorically disallowed as, at most, mere *dictum*, although such averments do not in and of themselves even rise to the category of *dictum* for purposes of this appeal.

In any case, to the extent such improper averments call for reply, it should be noted for the sake of argument only that McKinney became so woefully disabled in April 2019 only because of Appellee's knowing and willful constant harassment and embarrassment of McKinney, coupled with its stubborn refusal to offer any accommodation, any consideration of accommodation, or to enter into any meaningful particularized and individualized inquiry, as demonstrated herein, in Appellant's opening brief on appeal, and below. This constituted unlawful, unwarranted, and unjustifiable employment disciplinary action which served only to take time and energy away from, and unnecessarily distract, McKinney, so as to effectively take away from McKinney's work and contributions to her employer through no fault of her own, through the fault of Appellee, only.

well-settled controlling law.

Its attempt to aver admissions on McKinney's part on this subject, Appellee improperly resorts to statements of Appellee's Brian Jacks that are both incorrect and based solely on impermissible hearsay statements of McKinney made in meetings with Jacks that were, as conclusively characterized by Jacks, to the effect that McKinney she "can't focus," and wondered aloud whether that was simply because she was "just getting old," as part of her continuing overture to Appellee to engage in the required iterative process of making individualized inquiry and otherwise exploring sufficiently the allowance of some type of reasonable accommodation or accommodations for her disability. Appellee's Brief at p. 5.

In fact, no such meetings took place, at least none to which McKinney was ever a party. Appellee falsely contends meetings were had that did not, in fact, happen. If in fact such conversations took place, McKinney was never made aware that such interactions were considered by Appellee to have been engaging in the requisite "interactive process" to examine acceptable means to accommodate McKinney's disability. McKinney had several ideas to offer had Appellee given her the opportunity to do so, such as the introduction of an ADHD coach into the process – a benefit for which Appellee even received grants. Appellee staunchly refused to give McKinney at any time the opportunity to discuss available resources.

Appellee also makes reference to notes of its Rachel Chordash, also

containing hearsay statements apparently attributable to McKinney about an alleged second meeting, in which Chordash says McKinney said she would "try to figure out what's a reasonable accommodation." Appellee's Brief at p. 5. Yet again, Appellee unfairly omits crucial countervailing record evidence, such as, Chordash's own deposition testimony the McKinney was still eligible for a year of addition leave after her FMLA leave under the collective bargaining agreement.[5]

Plainly, the evidence demonstrates that Appellee never made any good faith effort to satisfy its legal obligations owing to McKinney. Despite the conclusory allegation that "Defendant made a good faith effort to help," (Appellee's Brief at p. 7) the evidence demonstrates the contrary. Far from helping McKinney, Appellee

---

[5] Appellee further relies on allegations McKinney never responded to efforts made to contact her and "never returned." Appellee's Brief at p. 5. In fact, letters from H.R. were not sent to McKinney at her proper address but, instead, were sent to her old address, never reaching her for that reason. The address to which they sent the letters had not been McKinney's address for ten years at the time. Further, Appellees choose to conceal crucial countervailing evidence that McKinney was, in fact, in contact with H.R. via email and that McKinney faxed and caused to be faxed, and emailed and caused to be emailed, several communications evidencing her valid and reasonable attempt to meet all document requirements imposed by Appellee, with McKinney missing only one "deadline" that Appellee unilaterally imposed, a deadline that Appellee had repeatedly and confusedly had changed, time and again.

　Appellee further fails to inform this Honorable Court that to the extent McKinney may be fairly accused of "missing" such a "deadline," Appellee, to be only fair, should also have pointed out that McKinney "missed" Appellee's capriciously-imposed "deadline" *by just one day*, which error, to the extent it may fairly be called an "error," certainly cannot be argued to have been material, prejudicial in any way to the rights of Appellee, and in any way consequential for purposes of this litigation or otherwise.

13

engaged in a campaign solely to "put McKinney through" hoops leading to the demise of her employment in effecting, among other things, its practice upon McKinney even in her delicate state to demand, time and again, that she continually subject document after document to meet its demands, all without any scintilla of help or guidance from H.R. or McKinney's supervisors in doing so, interfering with and against the orders of her primary care physician, Dr. Chang, to allow McKinney time and opportunity to heal without undue disruption or harassment, and, ultimately, terminating her employment while the process to examine means and opportunities for the reasonable accommodation of her disability had not even really begun.

Because such legally-mandated process never even started because of the manipulations, distractions, failures, and refusals to enter into such cooperative process in good faith, no court can even begin to address in any meaningful way whether, if allowed such accommodations, McKinney would have been qualified and able not only to perform all of the necessary core, essential functions of her job, but one hundred percent of the requirements of her position.[6]

---

[6] Likewise fallacious and lacking in any proper factual or foundational support is Appellee's bald contention that McKinney could not perform job duties. McKinney became disabled only after termination of her employment and events occurring in the wake of that termination. She had been an employee considered no less than outstanding prior to changes in supervision, the harsh imposition of a substantially increased workload without explanation or rationale, changes in supervision, and losing an actual desk and office. Appellee refused repeatedly to engage in an

It was error for the trial court to reject McKinney's claims for unlawful disability discrimination and retaliation.

Respectfully submitted,

CRANBROOK LAW GROUP, P.C.

By /s/ *Barry R. Powers*
BARRY R. POWERS

DATED: February 13, 2024

---

interactive process, and did not even come close to exercising good faith in addressing McKinney's requests to explore reasonable accommodation of her with her disability. Further, as testified by Appellee's own witness, Chordash, under the CBA McKinney still had an addition year of leave to which she was entitled. Nor did McKinney fall utterly out of communication with Appellee at any point. The record of emails and faxes demonstrates that McKinney submitted to Appellee everything it asked for, including reasonable requests for extensions of time on appellee's arbitrarily imposed "deadlines." Nevertheless, McKinney properly submitted the requested information well within a reasonable time. In light of such, reversal and remand is the only appropriate conclusion for this Court. *Hostettler v Coll. Of Wooster*, 895 F.3d 844, 856, 858-859 (6th Cir. 2018) *v Coll. Of Wooster*, 895 F.3d 844, 856, 858-859 (6th Cir. 2018). *Hostettler* stands as clear and controlling authority directly on point, yet Appellee makes not even an attempt to distinguish or even address it. Having made such tacit admission, Appellee finds itself with no option other than to attack McKinney on stale, hackneyed, and inapplicable hyper-technicalities on the judicial review process, owing only to an underdeveloped factual record below, seeking to take advantage and exploit such to the unfair disadvantage of McKinney, who lacks any fault whatsoever for the failure of Appellee to engage in the iterative individualized examination to identify workable reasonable accommodations.

Certificate of Service

    I hereby certify that on February 13, 2024 a true and correct copy of the foregoing was filed electronically using the CM/ECF system, which will send notification of such filing to all attorneys of record.

*/s/ Barry R. Powers*
BARRY R. POWERS
